Magomed Gusein Gasanov, Esq. (CA SBN: 368130)
137 S Crescent Dr., Apt. 3
Beverly Hills, CA 90212
gasanov.mgz@gmail.com
213-642-9978

*Attorney for Petitioner*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| HYEON KOOK OH,<br><br>Petitioner,<br><br>v.<br><br>ERNESTO SANTACRUZ, JR., Field Office Director, ICE Los Angeles Field Office; DAVID J. VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security; TODD BLANCHE, Attorney General of the United States; and WARDEN of the Adelanto ICE Processing Center, Adelanto, California,<br><br>Respondents. | Case No. 5:26-cv-05146<br><br>PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241<br><br>IMMIGRATION DETENTION — EXPEDITED CONSIDERATION REQUESTED<br><br>A# 235-376-368 |

## TABLE OF CONTENTS


**I. INTRODUCTION ..... 4**

**II. JURISDICTION AND VENUE ..... 6**

**III. PARTIES ..... 7**

**IV. EXHAUSTION IS NOT REQUIRED ..... 7**

**V. STATEMENT OF FACTS ..... 8**

A. Petitioner ..... 8

B. Lawful Admission on an L-1 Visa (2005) ..... 8

C. Change of Status to E-2 Treaty Investor (2007) ..... 9

D. The Life Petitioner Built Here ..... 10

E. Nineteen Years of Government Acquiescence ..... 11

F. The Approved Petition and Pending Adjustment Application ..... 12

G. The Korean Arrest Warrant ..... 13

H. The Arrest at the USCIS Interview ..... 15

I. No Warrant Preceded the Arrest ..... 16

J. The Notice to Appear — and Petitioner's Immediate Request for a Hearing ..... 17

K. USCIS Confirms Petitioner Is Not an Arriving Alien ..... 17

L. Bond Proceedings ..... 18

M. Petitioner's Medical Condition ..... 19

N. Deterioration in ICE Custody ..... 20

**VI. CLAIMS FOR RELIEF ..... 21**

**COUNT ONE (Procedural Due Process Violation) ..... 21**

A. Petitioner Held a Protected Liberty Interest in Remaining at Liberty ..... 22

B. The First *Mathews* Factor: The Private Interest at Stake ..... 25

C. The Second *Mathews* Factor: The Risk of Erroneous Deprivation and the Value of the Omitted Safeguard ..... 26

D. The Third *Mathews* Factor: The Government's Interest .......................... 28
E. Balance and Remedy ........................................................................ 29
F. In the Alternative: The August 27 Hearing Did Not Satisfy Due Process 30
**COUNT TWO (Procedural Due Process Violation) ....................................... 31**
A. This Court Has Jurisdiction Over the Claim, and No Exhaustion Is Required. .......................................................................... 31
B. Governing Standard ........................................................................ 33
C. The Five Factors Establish That Petitioner's Detention Has Become Punitive ........................................................................ 35
1. Length of detention and its relation to the regulatory purpose. ........ 35
2. The Government's contribution to the posture of this case. ............. 35
3. The evidence supporting flight risk or dangerousness. ..................... 36
4. Less harsh alternatives are available. .............................................. 37
5. The conditions of Petitioner's detention. ......................................... 38
D. Conclusion ........................................................................ 40
**COUNT THREE (Lack of Warrant in Violation of § 1357(a)(2)) ................. 41**
A. Section 1226(a) Authorizes Detention Only on a Warrant, and Respondents Have Invoked No Other Authority ................................. 41
B. The Form I-200 in This Record Does Not Satisfy § 1226(a); On Its Face It Was Generated After the Arrest ........................................................ 42
C. If No Warrant Preceded the Arrest, § 1357(a)(2) Is the Only Possible Authority, and Its Escape Predicate Fails on This Record .................... 44
D. The Remedy Is Release ........................................................................ 47
**VII. A LIMITED PERMANENT INJUNCTION AGAINST RE-DETENTION IS WARRANTED ........................................................ 49**
**PRAYER FOR RELIEF ........................................................................ 51**
**VERIFICATION ........................................................................ 53**

**I. INTRODUCTION**

Petitioner Hyeon Kook Oh (A# 235-376-368), a sixty-seven-year-old citizen of the Republic of Korea, came to the United States as a transferred corporate executive. In 2005 a United States entity petitioned for him, USCIS approved the petition, a consular officer issued him an L-1 visa, and a CBP officer inspected and admitted him at Los Angeles International Airport. In 2007 USCIS adjudicated a second application on the merits and granted him E-2 treaty investor status — a classification that required the agency to find he had invested substantial capital in a real United States enterprise. He has never entered unlawfully, never been in removal proceedings, never been ordered removed, never failed to appear, and never been arrested for any crime in the United States. (¶¶ 1–9.)

In the nineteen years after USCIS last adjudicated his status, the Government took no enforcement action against him of any kind. He lived openly at one address for the past ten years with his lawful permanent resident wife of forty-one years, held a REAL ID-compliant driver's license, and was treated for gastric cancer at a county public hospital under his own name. Then, in December 2024, he came forward. His United States citizen daughter filed an immediate-relative petition; he filed an application to adjust status disclosing his identity, his address, his entry, his nonimmigrant history, and his overstay; and he appeared for biometrics as instructed. The Government retained his application, approved the petition, and scheduled him for an interview — without detaining him and without initiating removal proceedings. (¶¶ 10–22.)

On July 24, 2026, Petitioner appeared on time for that interview at 300 North Los Angeles Street with the daughter who had petitioned for him. Officers of the ICE Los Angeles Foreign Fugitive Unit, who had received a USCIS lead referral five weeks earlier, watched him enter the building at approximately 8:45 a.m., waited through the interview, and entered the room at its conclusion to arrest him. He received no notice that his liberty was in question and no opportunity to be heard.

Nothing in the record reflects that any warrant issued before the seizure; the Form I-200 Respondents produced is dated the day of the arrest, is signed by an officer who did not make it, and recites as probable cause two events that occurred at or after the arrest itself. The custody determination is time-stamped more than two hours later. The sole charge of removability is a visa overstay. (¶¶ 28–39.)

He has been detained at Adelanto ever since the arrest. On August 27, 2026, bond was denied on the ground that he had failed to carry his own burden of disproving flight risk. The Government's evidentiary showing was a single document — an unadjudicated ex parte arrest warrant issued in Korea in 2025, for alleged corporate conduct largely predating his 2005 admission, on which there is no conviction, no extradition request, and no Red Notice. In the weeks since, this post-gastrectomy oncology patient with type 2 diabetes and a sepsis hospitalization one year before his arrest has tested positive for COVID-19, been placed alone in isolation, lost the ability to walk unassisted, and been issued a walker. (¶¶ 23–27, 40–66.)

Petitioner brings three independent and separately sufficient claims. His seizure and continued confinement without notice or a pre-deprivation hearing violate the procedural component of the Fifth Amendment Due Process Clause. His continued confinement is excessive in relation to any regulatory purpose it could serve and violates the substantive component. And his warrantless arrest exceeded Respondents' statutory authority under 8 U.S.C. §§ 1226(a) and 1357(a)(2). He seeks a writ ordering his immediate release on the conditions of liberty that existed before July 24, 2026, and a limited permanent injunction barring re-detention without notice and a pre-deprivation hearing before a neutral decisionmaker.

## II. JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. §§ 2241 and Article I, § 9, cl. 2 of the United States Constitution. Petitioner is in Respondents' custody under color of federal authority in violation of the Constitution and laws of the United States.

Section 1226(e) poses no bar. It does not strip jurisdiction over constitutional claims or questions of law. *Martinez v. Clark*, 124 F.4th 775, 781–82 (9th Cir. 2024); *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011). Petitioner does not ask this Court to review any discretionary custody judgment.

Sections 1252(a)(5), 1252(b)(9), and 1252(g) pose no bar. Those provisions reach removal orders and the three specific actions enumerated in § 1252(g); they do not reach claims challenging the legality of detention. *Jennings v. Rodriguez*, 583 U.S. 281, 293–94 (2018); *Gonzalez v. U.S. Immigration & Customs Enforcement*, 975 F.3d 788, 810–11 (9th Cir. 2020); *Flores-Miramontes v. INS*, 212 F.3d 1133 (9th Cir. 2000); see *Jam v. Mullin*, No. 5:26-cv-02986, 2026 U.S. Dist. LEXIS 132441 (C.D. Cal. June 12, 2026).

Venue is proper. Petitioner is confined at the Adelanto ICE Processing Center in San Bernardino County, within this District and its Eastern Division, where his immediate custodian is located. (¶ 59.) *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004).

Under 28 U.S.C. § 2243, the Court shall forthwith award the writ or order Respondents to show cause why it should not be granted, and the burden of showing cause rests on Respondents. Petitioner requests that any such order direct Respondents to identify the statutory provision they contend authorizes his detention.

## III. PARTIES

Petitioner Hyeon Kook Oh (A# 235-376-368) is a native and citizen of the Republic of Korea, born in 1958, detained at the Adelanto ICE Processing Center, 10250 Rancho Road, Adelanto, California 92301. (¶¶ 1, 59.)

Respondent Warden of the Adelanto ICE Processing Center is Petitioner's immediate physical custodian, named in his or her official capacity. Respondents Ernesto Santacruz, Jr. (Field Office Director, Los Angeles Field Office, ICE), David J. Venturella (Acting Director, ICE), Markwayne Mullin (Secretary, U.S. Department of Homeland Security), and Todd Blanche (Attorney General of the United States) are named in their official capacities to the extent necessary to effectuate Petitioner's release and the prospective relief requested.

Petitioner is represented by undersigned counsel, who was retained on September 3, 2026. Because Petitioner is detained and unable to execute a declaration in the ordinary course, this Petition is verified by counsel on his behalf pursuant to 28 U.S.C. § 2242. (¶¶ 46, 66; Declaration of Counsel "Gasanov Decl.") ¶¶ 1–5.)

## IV. EXHAUSTION IS NOT REQUIRED

Exhaustion is not statutorily mandated under § 2241, and prudential exhaustion does not apply here. Petitioner's claims are constitutional and statutory: they challenge the process by which he was seized, the authority under which he was seized, and whether his continued confinement has become excessive in relation to its regulatory purpose. An immigration judge cannot adjudicate any of them, and the Board of Immigration Appeals "has no jurisdiction to decide questions of the constitutionality of the immigration laws." *Liu v. Waters*, 55 F.3d 421, 426 (9th Cir. 1995). Agency expertise would add nothing to the record, and each day of delay compounds an ongoing deprivation of liberty suffered by a man whose health is deteriorating in custody. (¶¶ 61–65.) *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th

Cir. 2017); *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007); *Castillo v. Barr*, 449 F. Supp. 3d 915, 920 (C.D. Cal. 2020). Exhaustion is addressed further, as it bears on Count Two, below.

## V. STATEMENT OF FACTS

### A. Petitioner

1. Petitioner Hyeon Kook Oh is a 67-year-old native and citizen of the Republic of Korea, born in 1958, A235-376-368. (Ex. A at 1; Ex. B at 1; Y.J. Kim Decl. ¶ 2.)

2. He has never entered the United States unlawfully, has never been in removal proceedings before, has never been ordered removed, has never failed to appear for any immigration proceeding or appointment, and has never been arrested for any crime in the United States. (Declaration of Chloe Kim ("C. Kim Decl.") ¶ 3; Ex. A at 1.)

### B. Lawful Admission on an L-1 Visa (2005)

3. On March 15, 2005, Petitioner was inspected and admitted at Los Angeles International Airport as an L-1 nonimmigrant, authorized to remain until December 31, 2006. His passport bears the CBP admission stamp and his Form I-94 records the same. (Ex. C; Ex. A at 1 (Allegation 3); Ex. B at 1–2.)

4. The L-1 classification, INA § 101(a)(15)(L), 8 U.S.C. § 1101(a)(15)(L), is the intracompany transferee category. It is available to a person employed abroad for at least one continuous year by a firm that transfers him to a related United States entity to serve in a managerial or executive capacity or in a position requiring specialized knowledge. The classification is employer-petitioned: the United States entity must file, and USCIS must approve, a petition establishing the corporate relationship, the qualifying employment abroad, and the nature of the United States

position. Only then is a visa issued by a consular officer, and only then is the beneficiary inspected and admitted at a port of entry. The L category is also one of the few nonimmigrant classifications that permits dual intent — an L-1 nonimmigrant may pursue permanent residence without violating his status.

5. Petitioner's presence in this country thus began with a corporate petition adjudicated by USCIS, a visa issued after consular screening by the Department of State, and an inspection and admission by a CBP officer at a designated port of entry. (Ex. C; Ex. A at 1.)

**C. Change of Status to E-2 Treaty Investor (2007)**

6. On January 3, 2007, Petitioner applied to change his nonimmigrant status. On January 19, 2007, USCIS approved that application and granted him status as an E-2 treaty investor, authorized to remain until December 31, 2008. (Ex. B at 3; Ex. A at 1 (Allegation 4).)

7. The E-2 classification, INA § 101(a)(15)(E)(ii), 8 U.S.C. § 1101(a)(15)(E)(ii), is the treaty investor category. It is available to a national of a country with which the United States maintains a treaty of commerce and navigation — as it does with the Republic of Korea — who is in the United States solely to develop and direct the operations of an enterprise in which he has invested a substantial amount of capital. The investment must be substantial in relation to the cost of the enterprise, placed genuinely at risk in a real and operating commercial undertaking, and more than marginal. To grant the change of status, USCIS necessarily found that Petitioner had made such an investment in a real United States business.

8. Petitioner therefore came to the United States as a transferred corporate executive and then, with the Government's express approval, became a treaty investor building and directing his own enterprise here. Both classifications required

affirmative adjudication by USCIS on the merits. Neither was obtained by fraud, and DHS has never alleged otherwise. (Ex. A at 1; Ex. B at 3.)

9. Petitioner remained in the United States after December 31, 2008. That overstay is the entirety of the Government's case for removability. (Ex. A at 1–2; Ex. B at 3.)

**D. The Life Petitioner Built Here**

10. **Family.** Petitioner has been married to Won Ae Choi for forty-one years. She is a lawful permanent resident and lives with him. (C. Kim Decl. ¶ 4; Ex. B at 1.) Both of his daughters are here. Chloe Yerim Kim became a United States citizen on November 3, 2022; she lives in Las Vegas with her husband and child and works as a Pilates instructor. (C. Kim Decl. ¶¶ 1–2.) Ye Jin Kim is a lawful permanent resident residing in Fullerton, California, and was part of her father's household. (Y.J. Kim Decl. ¶ 1; C. Kim Decl. ¶ 4.) Petitioner also has young grandchildren here. (C. Kim Decl. ¶ 23.) DHS's own Form I-213 records his entire immediate family as present in the United States. (Ex. B at 1.)

11. **Home.** For ten years Petitioner has lived at the same address — 1303 S. Gramercy Place, Unit 315, Los Angeles, California 90019 — together with his wife. (C. Kim Decl. ¶ 4.) That is the address he gave the Government on his own immigration filings, the address DHS recorded on the Form I-213 when it arrested him, and the address to which USCIS mailed its July 27, 2026 notice. There is no discrepancy anywhere in this record between where Petitioner said he lived and where he in fact lived. (C. Kim Decl. ¶ 6; Ex. B at 1; Ex. E at 1.)

12. **Business and reputation.** The E-2 grant reflects that Petitioner invested substantial capital in, and directed, a United States enterprise. (Ex. B at 3.) Sein Shin, Head of Business Operations at SpaceMatch Inc., who has known Petitioner personally for more than ten years, writes under penalty of perjury that Petitioner's integrity, work ethic, commitment to family, and ability to build relationships based

on trust benefit the people and businesses around him, and that in his professional judgment Petitioner will respect every condition imposed on him and appear at every hearing. (Ex. M.)

13. **Church and community.** Six members of Petitioner's community submitted letters on his behalf in his bond proceedings. Three are clergy: the Reverend John Kim, Priest of Saint James Episcopal Church in Los Angeles; Byungsun So, Ph.D., Senior Pastor of Hope Church of SDA; and Vent Mou Kyung, a Buddhist monk of the Korea Sah Buddhist Temple. The others include a deacon of the Korean Gospel Presbyterian Church who has known Petitioner for ten years. (Ex. F at 8; Ex. M.)

14. **Medical care.** Petitioner has been a patient at Harbor-UCLA Medical Center in Torrance since early 2019, where he was treated for gastric cancer and remains under surveillance. His care is covered by Medi-Cal. His primary care provider there is Ji Young Lee, N.P. (Ex. L; Y.J. Kim Decl. ¶ 2; C. Kim Decl. ¶ 19.)

**E. Nineteen Years of Government Acquiescence**

15. USCIS last adjudicated Petitioner's immigration status on January 19, 2007, when it granted him E-2 status. In the nineteen years that followed — including more than seventeen years after his authorized stay expired — the United States Government took no enforcement action against him of any kind. It issued no charging document, sought no warrant, made no arrest, and never asked him to depart. (Ex. A at 1–2; Ex. B at 3.)

16. During those years Petitioner lived openly at a fixed address, was known to his church and community, and held a REAL ID-compliant United States driver's license, which DHS recorded on the Form I-213. (Ex. B at 3; C. Kim Decl. ¶ 4; Ex. F at 8.)

17. Beginning in December 2024, Petitioner placed himself directly before the Government: he filed an application for permanent residence disclosing his identity,

his address, his entry, his nonimmigrant history, and the fact of his overstay. He then appeared for biometrics as instructed. The Government retained his application, approved the underlying petition, and scheduled him for an interview — without detaining him and without initiating removal proceedings. (Ex. B at 3; Ex. D; C. Kim Decl. ¶¶ 6–8.)

18. The same daughter also petitioned for Petitioner's wife. That process was completed and she received lawful permanent resident status. (C. Kim Decl. ¶ 5.)

**F. The Approved Petition and Pending Adjustment Application**

19. On December 9, 2024 — nineteen months before any enforcement action — Petitioner's United States citizen daughter filed a Form I-130 immediate-relative petition on his behalf, and Petitioner filed a Form I-485 application to adjust status the same day. DHS's own Form I-213 confirms both filings and states that the I-485 "remains pending." (Ex. B at 3; Ex. D; C. Kim Decl. ¶ 6.)

20. USCIS approved the I-130 in the immediate-relative category "Parent of U.S. Citizen, 201(b) INA." The approval notice states that the beneficiary "wishes to apply for adjustment of status to that of a lawful permanent resident." (Ex. D; C. Kim Decl. ¶ 7.)

21. As the parent of an adult United States citizen, Petitioner is an immediate relative with no visa backlog; an immigrant visa is immediately available to him. Because he was inspected and admitted, the manner of his entry does not bar him from adjustment. His pending application is the only pathway to lawful status he has — and it exists only so long as he remains present and appears. (Ex. D; Ex. E at 1–2; C. Kim Decl. ¶ 27.)

22. USCIS scheduled Petitioner's adjustment interview for July 24, 2026 at its field office at 300 N. Los Angeles Street, Los Angeles. (C. Kim Decl. ¶ 8; Ex. B at 2.)

**G. The Korean Arrest Warrant**

23. On March 7, 2025, the Suwon District Court, Seongnam Branch, Republic of Korea, issued arrest warrant No. 2025-2769 naming a suspect with Petitioner's date of birth and Korean resident registration number. The charged offense is a violation of the Act on the Aggravated Punishment, etc. of Specific Economic Crimes (breach of trust), based on alleged corporate conduct at Nextel Co., Ltd. and its subsidiary occurring between January 2002 and March 2005 — before Petitioner's March 15, 2005 admission to the United States. (Ex. G at 6–7.)

24. Petitioner did not know that the warrant existed until after he was taken into ICE custody on July 24, 2026. He so informed undersigned counsel. (Gasanov Decl. ¶ 21.)

25. The warrant is a charging instrument, not an adjudication, and it establishes nothing beyond an allegation:

a. It is unadjudicated and ex parte. The face of the warrant shows it was requested by Prosecutor Jeong Ye-jin at 18:58 on March 6, 2025, and issued by Judge Kang Hyon-in the following day, March 7, 2025 — a one-day, one-sided proceeding at which Petitioner was neither present nor heard. (Ex. G at 6.)

b. There is no conviction. DHS has never alleged that Petitioner has been convicted of any offense, in the Republic of Korea or anywhere else. An accusation is not a conviction under INA § 101(a)(48)(A), 8 U.S.C. § 1101(a)(48)(A), which requires a formal judgment of guilt or an admission of facts sufficient to warrant one. Neither exists here. (Ex. G; Ex. A at 1.)

c. There is no extradition request and no Red Notice. DHS's August 23, 2026 filing consists of a single tabbed document — the warrant and its translation. (Ex. G at 3.) Nothing in the record reflects a request for extradition, a request for provisional arrest, an INTERPOL notice of any

color, or any communication whatsoever from the Republic of Korea to the United States regarding Petitioner.

d. The warrant contains no finding that Petitioner ever failed to appear. The box stating that "[t]he suspect did not respond to the investigative authorities' request to appear without justifiable reason" is unchecked. So is the box stating that "[t]he suspect has no fixed residence." (Ex. G at 6.)

e. DHS charged no criminal ground. The Notice to Appear charges a single ground of removability — INA § 237(a)(1)(B), overstay. No criminal ground, no fugitive ground, and no security ground is alleged, and DHS did not seek detention on dangerousness. (Ex. A at 1–2.)

26. The conduct alleged in the warrant — occurring between January 2002 and March 2005, more than twenty-one years before the filing of this Petition — raises a substantial questions of the limitations period applicability to the charged offense under the law of the Republic of Korea, such that the underlying proceeding may no longer be viable. DHS has submitted nothing bearing on that question.

27. DHS knew of the warrant well before it arrested Petitioner, and did not treat it as a criminal matter:

a. On June 11, 2026, USCIS approved Petitioner's Form I-130 — fifteen months after the Korean arrest warrant issued on March 7, 2025. (Ex. B at 3; Ex. D.)

b. On July 12, 2026, DHS certified an English translation of that same warrant — twelve days before Petitioner's arrest. (Ex. G at 5.)

c. DHS recorded the warrant in the Form I-213 narrative it prepared on the day of the arrest. (Ex. B at 3.)

d. Yet DHS charged no criminal ground, alleged no dangerousness, and did not place the warrant before the Immigration Court until August 23, 2026 — one month after the arrest, and four days before the bond hearing. (Ex. A at 1–2; Ex. G at 1, 11.)

**H. The Arrest at the USCIS Interview**

28. On June 17, 2026 — one week after USCIS approved the immediate-relative petition — ICE Enforcement and Removal Operations, Los Angeles Foreign Fugitive Unit (“FFU”), “received a lead referral from United States Citizenship and Immigration Services (USCIS) identifying OH as a visa overstay.” (Ex. B at 2, 3.)

29. ICE did not arrest Petitioner at the home whose address it had. It waited five weeks and arrested him when he appeared, as directed, at a government building for a government-scheduled appointment. (Ex. B at 2.)

30. On July 24, 2026, Petitioner appeared on time for his adjustment interview, accompanied by his daughter Chloe Yerim Kim — the petitioner on his approved I-130 — who traveled from Las Vegas to attend. They checked in with building security and were brought to an interview room. (C. Kim Decl. ¶¶ 8, 10.)

31. FFU officers were waiting for him. According to the Form I-213, officers “went to 300 N. Los Angeles Street, Los Angeles, CA where OH was scheduled for an interview related to an application he had filed with USCIS”; at approximately 0845 they observed “the target OH” entering the building; and “[a]t the conclusion of the interview with USCIS officers, at approximately 1000, FFU officers entered the interview room,” identified themselves, “arrested OH and escorted him to the ICE detention area for processing.” The I-213 describes this as “a targeted enforcement operation.” (Ex. B at 2, 3.)

32. Ms. Kim was asked very few questions before being told to leave the room and wait outside. Nothing said to her suggested anything was wrong with the petition or that her father was about to be arrested. While she waited, the officer continued to request documents from her — including her tax return and her passport — which she provided. She was then informed that ICE had taken her father into custody. She had walked into the building with her father and walked out without him. (C. Kim Decl. ¶¶ 10–13.)

33. Petitioner went to that building voluntarily, on the Government's instruction, carrying the documents the Government asked him to bring. He did not resist, did not attempt to leave, and did not try to avoid the appointment. (C. Kim Decl. ¶ 14.)

**I. No Warrant Preceded the Arrest**

34. Nothing in the record reflects that any warrant of arrest was issued or served before the arrest at approximately 10:00 a.m. on July 24, 2026. (Ex. A at 3; Ex. B at 2.)

35. The Form I-200 Warrant for Arrest of Alien is dated the day of the arrest and is signed by SDDO G. Sahagun, who is not among the three officers the I-213 identifies as having made the arrest. It recites that probable cause rests on "the execution of a charging document to initiate removal proceedings" and on "statements made voluntarily by the subject to an immigration officer" — events that occurred at or after the arrest itself. Its certificate of service shows service on Petitioner on July 24, 2026 by Deportation Officer Serna, one of the arresting officers. (Ex. A at 3; Ex. B at 2.)

36. The Form I-286 Notice of Custody Determination, also signed by SDDO Sahagun, is time-stamped "07/24/2026 12:19 PM" — more than two hours after the arrest. It recites that the determination was made under INA § 236 and orders Petitioner detained without bond. (Ex. A at 7.)

37. A warrantless immigration arrest requires reason to believe the person "is likely to escape before a warrant can be obtained." 8 U.S.C. § 1357(a)(2). The record establishes the opposite. DHS had certified a translation of the Korean warrant twelve days earlier; it had received a lead referral five weeks earlier; it knew Petitioner's home address; and it knew precisely where he would be and when, because the Government itself had calendared the appointment. An operation planned at least twelve days in advance, against a man with a scheduled federal

appointment, is the definitional opposite of circumstances leaving no time to obtain a warrant. (Ex. B at 1–3; Ex. G at 5.)

38. The Form I-213 records the disposition as "Warrant of Arrest/Notice to Appear" and contains no finding, and no facts capable of supporting a finding, that Petitioner was likely to escape before a warrant could be obtained. (Ex. B at 1.)

**J. The Notice to Appear — and Petitioner's Immediate Request for a Hearing**

39. The Notice to Appear served on Petitioner checks the box "You have been admitted to the United States, but are removable." The boxes for "arriving alien" and for an alien "who has not been admitted or paroled" are not checked. It charges the single ground of INA § 237(a)(1)(B). (Ex. A at 1–2.)

40. On the Form I-826, Petitioner was offered the option to give up his hearing and return to Korea as soon as arrangements could be made. He declined it and initialed instead: "I request a hearing before the Immigration Court to determine whether I may remain in the United States." (Ex. A at 4.)

41. He separately signed a Request for Prompt Hearing, waiving his ten-day period and asking to be brought before an Immigration Judge as soon as possible. (Ex. A at 5.)

42. On the Form I-286, he checked the box: "I do request an immigration judge review of this custody determination." (Ex. A at 7.)

43. Within hours of his arrest, Petitioner thus asked three separate times to be brought before an Immigration Judge rather than removed from the country. (Ex. A at 4, 5, 7.)

**K. USCIS Confirms Petitioner Is Not an Arriving Alien**

44. On July 27, 2026, USCIS administratively closed Petitioner's Form I-485. The notice states that Petitioner is in proceedings before an Immigration Judge, that

those proceedings have not been terminated, and — expressly — that "USCIS also determined that you are not an 'arriving alien.'" (Ex. E at 1.)

45. Because Petitioner "is a respondent in a removal proceeding and not an 'arriving alien,'" the notice explains, only EOIR has jurisdiction over his adjustment application, and the closure "does not prevent you from seeking adjustment of status before EOIR." His application for permanent residence therefore remains live before the Immigration Court, where he must appear in person to pursue it. (Ex. E at 1–2.)

**L. Bond Proceedings**

46. Petitioner was represented in bond proceedings by prior counsel, who filed a Request for Bond Redetermination supported by documentary exhibits and letters of support. Undersigned counsel did not represent Petitioner in those proceedings and was retained on September 3, 2026. (Ex. F; Gasanov Decl. ¶¶ 13, 16.)

47. On August 27, 2026, Immigration Judge Patrick D. Barrett denied bond, checking the box: "Denied, because Respondent failed to meet his burden to establish that he is not such a significant risk of flight that no amount of bond or alternatives to detention would be sufficient to mitigate it." The burden was placed on Petitioner. The Court summarized its analysis on the record; no written memorandum has issued, and the order states one will be provided only if Petitioner appeals. Appeal is due September 28, 2026. (Ex. H at 1–2.)

48. The Immigration Judge made no finding of dangerousness and no finding that Petitioner poses any threat to persons, property, or national security. The sole stated basis for his continued detention is flight risk. (Ex. H at 1.)

49. Petitioner's next hearing before the Immigration Court is set for September 23, 2026 at 1:00 p.m. (Ex. G at 1.)

**M. Petitioner's Medical Condition**

50. **Gastric cancer.** In February 2019, Petitioner was diagnosed at Harbor-UCLA with an aggressive, poorly differentiated gastric adenocarcinoma with signet ring cells. He received four cycles of chemotherapy between March and May 2019, suffering nausea, vomiting, hair loss, weight loss, and inability to eat. (Ex. J; Y.J. Kim Decl. ¶¶ 3–4.)

51. On June 21, 2019, surgeons removed most of his stomach in a subtotal gastrectomy with reconstruction and lymph node dissection; the operation had to be converted from robotic to open. He was hospitalized until June 26. (Ex. I; Y.J. Kim Decl. ¶ 5.)

52. The surgical wound became infected. Petitioner returned to the operating room twice more, on June 29 and July 2, 2019, and was discharged with a wound vacuum attached to his abdomen, which remained in place for approximately one year. Further chemotherapy followed. (Ex. I; Ex. J; Y.J. Kim Decl. ¶¶ 6–7.)

53. The gastrectomy permanently altered his digestion. He lost approximately forty pounds and continues to have difficulty eating. His Harbor-UCLA records list anemia, vitamin B12 deficiency, and vitamin D deficiency, and gastric adenocarcinoma remains an active problem under surveillance, requiring regular laboratory testing, imaging, and follow-up. (Ex. K; Y.J. Kim Decl. ¶¶ 8–9.)

54. **Diabetes.** Petitioner has type 2 diabetes and high cholesterol, requiring daily medication, blood sugar monitoring, and periodic laboratory testing. (Ex. L; Y.J. Kim Decl. ¶ 10; C. Kim Decl. ¶ 18.)

55. **Sepsis.** On July 25, 2025 — one year before his arrest — Petitioner became dizzy, collapsed at home, lost control of his bowels, and was taken to the Harbor-UCLA emergency department. He was admitted and discharged the next day, still febrile and on antibiotics, with diagnoses including sepsis and tubulo-interstitial nephritis. He has been increasingly weak ever since. (Ex. K; Y.J. Kim Decl. ¶ 11; C. Kim Decl. ¶ 18.)

56. **The Government was on notice.** DHS's own Form I-213 records abdominal surgical scars, notes Petitioner's report of stomach cancer, and states under "SUBJECT HEALTH STATUS": "The subject does not claim good health." (Ex. B at 2, 3.)

57. **His provider's warning.** In a letter dated July 29, 2026 — five days after the arrest — Petitioner's Harbor-UCLA primary care provider wrote that he requires "ongoing medical care, including routine follow-up visits, medication management, laboratory monitoring, and continued surveillance," that "maintaining continuity of medical care is important for his overall health," and that "[i]nterruption of his treatment or limited access to appropriate healthcare services could result in worsening of his chronic medical conditions, delays in identifying potential complications, and adverse health outcomes." (Ex. L.)

58. Because of his detention, Petitioner missed a follow-up appointment with that provider on August 21, 2026. (Y.J. Kim Decl. ¶ 9.)

**N. Deterioration in ICE Custody**

59. Petitioner has been detained at the Adelanto ICE Processing Center continuously since July 24, 2026. (Ex. A at 1; Gasanov Decl. ¶ 12.)

60. His daughter Ye Jin Kim speaks with him by telephone two to three times a day. (Y.J. Kim Decl. ¶ 13.)

61. Petitioner was initially able to receive his diabetes medication at the facility. He is currently unable to take it; he was told delivery has been delayed. More broadly, when he reports symptoms and medication is ordered, it often takes approximately a week to arrive, and what he receives is not the medication he had been taking. These delays and substitutions have prevented him from receiving the treatment on which he relied. (Y.J. Kim Decl. ¶¶ 10, 15; C. Kim Decl. ¶ 21.)

62. On September 1, 2026, Petitioner reported that he had tested positive for COVID-19 at Adelanto and had been placed alone in isolation. (Y.J. Kim Decl. ¶ 13; C. Kim Decl. ¶ 21; Gasanov Decl. ¶ 19.)

63. Petitioner reports that his condition has since significantly deteriorated and that he has become extremely weak; that he can no longer walk without assistance and has been issued a walker by the facility; and that he experiences constant dizziness and feels as though he may faint. Before detention he walked unaided and used no walker. (Y.J. Kim Decl. ¶¶ 14–15; C. Kim Decl. ¶ 21.)

64. The last time Petitioner fainted, in July 2025, he was found to have sepsis and required hospitalization. (Y.J. Kim Decl. ¶ 15.)

65. Petitioner is 67 years old, has had most of his stomach removed, has a history of cancer and multiple courses of chemotherapy, has type 2 diabetes, and was hospitalized for sepsis within the past fourteen months. Each is a recognized risk factor for severe illness from COVID-19. He is now COVID-positive, in isolation, unable to walk unassisted, and cut off from the providers who have treated him since 2019. (Ex. I; Ex. J; Ex. K; Ex. L; Y.J. Kim Decl. ¶¶ 14–16; Gasanov Decl. ¶ 20.)

66. Counsel was retained on September 3, 2026 and has not yet been able to obtain Petitioner's IHSC detention medical records. (Gasanov Decl. ¶ 19.)

## VI. CLAIMS FOR RELIEF

### COUNT ONE

### Violation of the Fifth Amendment Right to Procedural Due Process — Seizure at a Government-Scheduled Interview and Confinement Without Notice or a Pre-Deprivation Hearing

67. Petitioner realleges and incorporates each preceding paragraph.

68. The Due Process Clause protects noncitizens "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693

(2001). "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Id.* at 690. Due process generally "requires some kind of a hearing *before* the State deprives a person of liberty." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990); *Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017).

69. The analysis proceeds in two steps: whether a protected liberty interest exists, and what process was required before its deprivation. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). The second step is governed by *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022).

**A. Petitioner Held a Protected Liberty Interest in Remaining at Liberty**

70. "Freedom from physical restraint [is] a fundamental right." *Foucha v. Louisiana*, 504 U.S. 71, 86 (1992). "Even individuals . . . over whose liberty the government wields significant discretion retain a protected interest in their liberty." *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025).

71. Petitioner's presence in this country was authorized by the United States two times, each time by affirmative adjudication rather than by inaction. First in 2005 he was admitted at Los Angeles International Airport on an employer-petitioned L-1 visa, after USCIS approved the petition, a consular officer issued the visa, and a CBP officer inspected him. (¶¶ 3–5.) Second, in 2007 USCIS adjudicated his application on the merits and granted him E-2 treaty investor status. (¶¶ 6–8.) In June 2026 USCIS approved the immediate-relative petition filed by his United States citizen daughter, told him in writing to apply for permanent residence, and scheduled him for an interview to do so. (¶¶ 17, 19–22.) His liberty was not self-created. The Government conferred it, renewed it, and — six weeks before it seized him — approved the petition on which his path to permanent residence rests.

72. In the nineteen years after USCIS last adjudicated his status, the Government took no enforcement action of any kind: no charging document, no warrant, no arrest, no request to depart. (¶ 15.) Throughout those years Petitioner lived openly at a fixed address, held a REAL ID driver's license, and was known to his church and community. (¶¶ 11, 13, 16.) In December 2024 he placed himself directly before the Government, disclosing his identity, his address, his entry, and the fact of his overstay, and appeared for biometrics as instructed. The Government retained his application, approved the underlying petition, and scheduled him for an interview — without initiating removal proceedings. (¶ 17.)

73. Where the government knows of a noncitizen's presence, affirmatively approves it, and then declines for years to detain him, it may not extinguish his liberty without pre-deprivation process. "[A]lthough the government did not detain and then release her, it made a decision not to detain her in the first place; Petitioner thus has the same liberty interest in her continued freedom as an individual initially detained." *Kharitonova v. Albarran*, 2026 U.S. Dist. LEXIS 39213, at *5–6 (N.D. Cal. Feb. 25, 2026). The contrary contention — that one never previously detained holds no such interest — is "specious" and "unsupported by any legal authority." *Id.*

74. *Kalkan v. Chestnut*, 2026 U.S. Dist. LEXIS 59347, at *3 (E.D. Cal. Mar. 20, 2026), describes Petitioner exactly: a noncitizen holds a protected liberty interest where immigration officials "were aware of his presence, initially approved of that presence, and did not promptly detain him when that status expired." *Kalkan* grounded that rule in *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972): the decision not to detain, like a grant of parole, is "based on an evaluation," allows "a relatively normal life," and induces reliance on "at least an implicit promise" that liberty will be revoked only for cause. *Kalkan* applied it to a nonimmigrant entrant with a spouse-filed I-130 whom the government had not detained when his status lapsed.

75. The interest does not depend on an asylum filing or on anything that tolls unlawful presence. In *Vazquez v. Mullin*, 2026 U.S. Dist. LEXIS 147354, at *9

(W.D. Wash. July 2, 2026), a J-1 overstay who had filed nothing held a protected liberty interest arising solely from the government's years of acquiescence and his ties here. In *Xihui Huang v. Blanche*, 2026 U.S. Dist. LEXIS 178076, at *23 (W.D. Wash. July 15, 2026), a B-2 overstay charged, like Petitioner, only under INA § 237(a)(1)(B) was arrested in the middle of her USCIS I-130 interview; the court found a protected liberty interest and ordered release. Petitioner's case is stronger than either. His petition was not merely pending but approved. (¶ 20.)

76. This Court has already applied these principles to the precise enforcement pattern at issue. In *Yu v. Giles*, 2026 U.S. Dist. LEXIS 189002 (C.D. Cal. Aug. 21, 2026), the ERO Los Angeles Foreign Fugitive Unit received a "lead referral" from USCIS, waited for the petitioner's scheduled USCIS interview, entered the interview room at its conclusion, and arrested him on the strength of a foreign warrant; the sole charge was overstay. *Id.* at *3–4. The Court held that he held a protected liberty interest because "for more than five years the Government knew exactly who and where Petitioner was . . . and chose not to detain him," *id.* at *12, and ordered immediate release. Every element is present here, by a wider margin: the same unit, the same "lead referral," the same interview-room arrest, the same sole charge, the same foreign warrant, and nineteen years rather than five. (¶¶ 15, 28–31.) Accord *Jam v. Mullin*, 2026 U.S. Dist. LEXIS 132441, at *5–7 (C.D. Cal. June 12, 2026) (arrest at USCIS interview); *Xingang Zhao v. Janecka*, 2026 U.S. Dist. LEXIS 102817 (C.D. Cal. May 7, 2026) (same); *Grigoryan v. Lyons*, 2026 U.S. Dist. LEXIS 159668, at *3–4 (C.D. Cal. June 16, 2026); *Martinez v. Acting Warden of the Adelanto Det. Ctr.*, 2026 WL 2262269, at *5 (C.D. Cal. Aug. 5, 2026); *Gagik T. v. Chestnut*, 2026 WL 1837413, at *3 (E.D. Cal. June 25, 2026) (a noncitizen "who has lived at liberty for years while his immigration case proceeds — pursuant to the Government's affirmative decision not to detain him — holds a protected liberty interest in remaining free from custody, and may not be detained without pre-deprivation process").

77. The circumstances of the seizure confirm the interest. Respondents did not find Petitioner; they sent for him. USCIS scheduled the appointment, and he appeared on time, with his daughter, carrying the documents the Government asked him to bring. He checked in with security, was brought to an interview room, and answered the agency's questions. Only when the interview concluded did officers who had been waiting since 8:45 a.m. enter the room and arrest him — while another officer continued to collect documents from his daughter in the hallway. (¶¶ 29–33.) A person who presents himself at a federal office at the Government's invitation, to advance a petition the Government has already approved, is the antithesis of one whose appearance cannot be assured.

**B. The First *Mathews* Factor: The Private Interest at Stake**

78. The private interest is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004); *Rodriguez Diaz*, 53 F.4th at 1207. It is at its height for a noncitizen whom the government has permitted to build "an out-of-custody life in the United States." *Pinchi*, 792 F. Supp. 3d at 1033. Petitioner spent twenty-one years building such a life, in the open and with federal authorization.

79. He is sixty-seven. He has been married for forty-one years to a lawful permanent resident with whom he shares a home of ten years. Both daughters — one a citizen, one a permanent resident — and his grandchildren are here. DHS's own I-213 records his entire immediate family as present in the United States. (¶¶ 10–11.) Clergy of three faiths and members of his community vouch for him. (¶ 13.)

80. His health makes the deprivation weightier still. He is a gastric cancer patient who has had most of his stomach removed, suffered post-operative infection requiring two further surgeries and a year with a wound vacuum, lost forty pounds, and remains under active surveillance for the malignancy. He has type 2 diabetes requiring daily medication. One year before his arrest he collapsed at home and was hospitalized with sepsis. (¶¶ 50–55.) His provider warned in writing, five days after

the arrest, that interruption of his care "could result in worsening of his chronic medical conditions, delays in identifying potential complications, and adverse health outcomes." (¶ 57.) That warning has been borne out. In custody his diabetes medication has been delayed and substituted; he has tested positive for COVID-19 and been placed in isolation; and he has become so weak that he can no longer walk without a walker and experiences constant dizziness and near-fainting — the same presentation that, the last time it occurred, was sepsis. (¶¶ 61–65.)

81. Detention also strikes at the relief said to justify the proceeding. Petitioner's approved petition makes him eligible to adjust status, and USCIS has confirmed in writing that he is not an arriving alien and that his adjustment application remains live before the Immigration Court. (¶¶ 21, 44–45.) That application is the only pathway to lawful status he has, and it supplies the strongest possible motive to appear. *Xihui Huang*, 2026 U.S. Dist. LEXIS 178076, at *20. Confinement does not advance its adjudication; it forces a sixty-seven-year-old cancer patient to litigate it from custody, with a first hearing on September 23, 2026 and the merits, any appeal, and any petition for review months or years beyond. (¶ 49.)

82. This factor weighs heavily for Petitioner.

### C. The Second *Mathews* Factor: The Risk of Erroneous Deprivation and the Value of the Omitted Safeguard

83. Petitioner received no notice that his liberty was in question and no opportunity to be heard before he was seized. (¶¶ 29–33.) Where a petitioner has not received any custody hearing before detention, the risk of erroneous deprivation "is high." *Kharitonova*, 2026 U.S. Dist. LEXIS 39213, at *7; *Jam*, 2026 U.S. Dist. LEXIS 132441, at *8.

84. The bond hearing he later obtained does not cure the violation. "[C]ourts in this District have concluded that a post-deprivation bond hearing ordinarily 'is not

an adequate substitute' for a pre-deprivation hearing." *Herman v. DHS*, 2026 U.S. Dist. LEXIS 133109, at *5 (C.D. Cal. June 12, 2026) (collecting cases), quoted in *Yu*, 2026 U.S. Dist. LEXIS 189002, at *13. Such a hearing "cannot serve as an adequate procedural safeguard because it is after the fact and cannot prevent an erroneous deprivation of liberty." *E.A.T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1324 (W.D. Wash. 2025); accord *Vazquez*, 2026 U.S. Dist. LEXIS 147354, at *6; *Xihui Huang*, 2026 U.S. Dist. LEXIS 178076, at *12; *Galvez-Mondragon v. Warden, Cal. City Corr. Ctr.*, 2026 U.S. Dist. LEXIS 151996, at *3 (E.D. Cal. July 9, 2026).

85. Courts have ordered release in precisely Petitioner's posture — a post-arrest bond request denied on flight-risk grounds. In *Yu*, the immigration judge denied bond because the petitioner "failed to meet his burden to establish that he is not such a significant risk of flight that no amount of bond or alternatives to detention would be sufficient to mitigate it," 2026 U.S. Dist. LEXIS 189002, at *5 — the identical language of the August 27, 2026 order here (¶ 47) — and the Court nonetheless ordered release. *Id.* at *12–13. *Galvez-Mondragon* ordered release with a bond appeal pending. 2026 U.S. Dist. LEXIS 151996, at *2–3. *Xihui Huang* ordered release after an I-130-interview arrest and a bond denial that was never appealed. 2026 U.S. Dist. LEXIS 178076, at *5, *23.

86. The hearing Petitioner received illustrates why after-the-fact process is no substitute. The burden was placed on him to prove a negative. No finding of dangerousness was made; the sole stated basis for detention is flight risk. (¶¶ 47–48.) And the Government's showing consisted of a single document: a Korean arrest warrant for alleged corporate conduct between 2002 and 2005 — before Petitioner ever entered the United States — issued ex parte in a one-day proceeding, on which there is no conviction, no extradition request, no INTERPOL notice, and no finding that Petitioner ever failed to appear. (¶¶ 23–25.) Petitioner did not know the warrant existed until after his arrest. (¶ 24.) DHS did: it certified a translation twelve days before the arrest, and still charged no criminal ground and alleged no dangerousness.

(¶ 27.) An unadjudicated accusation is not evidence of flight or danger. *Grigoryan*, 2026 U.S. Dist. LEXIS 159668, at *4–5 (uncharged grand-theft arrest supplied "no evidence" that detention was necessary); *Yu*, 2026 U.S. Dist. LEXIS 189002, at *4–5 (release ordered notwithstanding foreign warrant the government never authenticated). A process in which an accusation stands in for adjudication, and the detainee must disprove the accuser's inference, is the mechanism of erroneous deprivation that *Mathews* exists to prevent.

87. The value of the omitted safeguard is correspondingly high. *Gagik T.*, 2026 WL 1837413, at *4. At a hearing at which the Government bore the burden, it would have had to justify detention for an immigrant with a lawful admission and two USCIS adjudications in his favor; nineteen years without enforcement action; a fixed address matching every record the Government holds; a forty-one-year marriage, two daughters, and grandchildren here; an approved immediate-relative petition and a live adjustment application; no arrest of any kind in the United States; a documented need for continuing cancer surveillance and diabetes care; and his own conduct at the moment of arrest. (¶¶ 2, 10–11, 15, 19–21, 40–43, 50–57.).

88. This factor weighs heavily for Petitioner.

### D. The Third *Mathews* Factor: The Government's Interest

89. Respondents' interest in detaining Petitioner without notice and a hearing is minimal, and no fiscal or administrative burden stood in the way. "In immigration court, custody hearings are routine and impose a minimal cost." *Singh v. Andrews*, 803 F. Supp. 3d 1035, 1048 (E.D. Cal. 2025) (cleaned up). Notice and a custody hearing "are the very process contemplated under 8 U.S.C. § 1226(a)." *Xianming H. v. Warden*, 2026 U.S. Dist. LEXIS 103412, at *11 (E.D. Cal. May 11, 2026).

90. Respondents' own conduct forecloses any claim of urgency. The petition and adjustment application were filed nineteen months before the arrest. USCIS approved the petition on June 11, 2026, referred Petitioner to the Foreign Fugitive

Unit one week later, certified a translation of the Korean warrant on July 12, and then waited for the interview it had itself calendared. (¶¶ 27–29, 37.) Throughout, Respondents knew Petitioner's name, address, photograph, and the date, time, and room in which he would next appear before a federal officer. An agency that can mail a notice instructing a man to appear for an interview can mail a notice instructing him to appear for a custody hearing. Respondents chose the first and withheld the second. They plainly possess the machinery — they served a custody determination and offered immigration-judge review the same afternoon (¶¶ 36, 42) — and simply ran it after the seizure instead of before. "Respondents, in effect, already made [a custody] determination with respect to petitioner when they decided not to detain her in the first place." *Jam*, 2026 U.S. Dist. LEXIS 132441, at *8.

91. Civil immigration detention may serve only two purposes: preventing flight and protecting the community. *Zadvydas*, 533 U.S. at 690; *Hernandez*, 872 F.3d at 990–91. Respondents have never asserted that Petitioner is dangerous, and the immigration judge made no such finding. (¶¶ 25(e), 48.) No conduct by Petitioner indicating flight or danger changed during that period. The only adverse development Respondents identify is the unadjudicated Korean warrant issued in 2025; yet after DHS obtained and translated it, Petitioner still appeared voluntarily at the Government-scheduled interview..

**E. Balance and Remedy**

92. All three *Mathews* factors favor Petitioner. He was entitled to notice and an opportunity to be heard before Respondents took his liberty. He received neither. His detention violates the Fifth Amendment.

93. A small number of decisions have held that a noncitizen never previously detained holds a lesser interest, or that a prompt post-deprivation hearing suffices. See *Jemna v. Warden of Otay Mesa Det. Ctr.*, 2026 WL 788172, at *5 (S.D. Cal. Mar. 20, 2026); *Zakharenkova v. Mullin*, 2026 U.S. Dist. LEXIS 124195, at *5 (C.D.

Cal. May 19, 2026). They are against the clear weight of authority in this District, including every decision addressing arrest at a government-scheduled USCIS interview. And they do not reach this case on their own terms: whatever the adequacy of a prompt post-deprivation hearing in the abstract, the one Petitioner received placed the burden on him, made no danger finding, and rested on an unadjudicated foreign accusation. (¶¶ 47–48.)

94. The remedy is immediate release restoring the conditions of liberty that existed before July 24, 2026. "[T]he purpose of habeas remedies is to put the defendant back in the position he would have been in if the constitutional violation never occurred." *Lujan v. Garcia*, 734 F.3d 917, 935 (9th Cir. 2013) (cleaned up); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). That principle "has particular force where, as here, the protections at issue are intended to prevent an unlawful detention in the first place." *Yu*, 2026 U.S. Dist. LEXIS 189002, at *13. Courts in this District and this Circuit have ordered exactly this relief on comparable and less compelling records. *Yu*, at *13–14; *Jam*, at *10–12; *Grigoryan*, at *5; *Xingang Zhao*, 2026 U.S. Dist. LEXIS 102817; *Xihui Huang*, at *23; *Vazquez*, at *9; *Kalkan*, at *3; *Kharitonova*, at *4; *Galvez-Mondragon*, at *4–5.

95. Release should be accompanied by the limited injunction against re-detention described in Section VII and by an order that Respondents return Petitioner's property, including his driver's license and passport, upon release.

**F. In the Alternative: The August 27 Hearing Did Not Satisfy Due Process**

96. If the Court declines to order immediate release, Petitioner alleges in the alternative that the August 27, 2026 bond hearing did not satisfy due process and that any further custody hearing must. Due process requires that the government bear the burden of proving by clear and convincing evidence that the noncitizen is a flight risk or a danger and that no condition or combination of conditions could reasonably

assure his appearance, *Singh v. Holder*, 638 F.3d 1196, 1203–04 (9th Cir. 2011); that the immigration judge consider ability to pay and alternatives to detention, *Hernandez*, 872 F.3d at 994; and that the judge make an individualized determination and articulate a meaningful rationale, *Martinez v. Clark*, 124 F.4th 775, 783–85 (9th Cir. 2024).

97. The August 27 hearing met none of these requirements. The burden was placed on Petitioner. No finding of dangerousness was made. No written rationale has issued, and the order states that one will be provided only if Petitioner appeals. (¶¶ 47–48.) *Xihui Huang* held that an immigration judge who fails to apply the proper standards to a bond determination, and whose order does not reflect consideration of the record or of alternative conditions, both abuses his discretion and violates the Due Process Clause, and ordered release on that independent ground. 2026 U.S. Dist. LEXIS 178076, at *19–22. At minimum, Petitioner is entitled to a custody hearing within seven days before a neutral decisionmaker at which Respondents bear the burden of justifying his detention by clear and convincing evidence and the decisionmaker considers alternatives to detention.

## COUNT TWO

## Violation of the Fifth Amendment Right to Substantive Due Process — Continued Detention Excessive in Relation to Its Regulatory Purpose

98. Petitioner incorporates by reference each of the foregoing paragraphs.

### A. This Court Has Jurisdiction Over the Claim, and No Exhaustion Is Required

99. The claim is cognizable in habeas. Petitioner does not ask this Court to superintend the Adelanto ICE Processing Center or to order any particular course of treatment. He challenges the lawfulness of his continued confinement itself, and he seeks release. A claim lies at the core of habeas where "a successful petition demonstrates that the detention itself is without legal authorization." *Pinson v.*

*Carvajal*, 69 F.4th 1059, 1070 (9th Cir. 2023). *Pinson* expressly reserved the question whether a conditions-based claim may proceed in habeas, *id.* at 1075 & n.15, and it addressed federal prisoners serving criminal sentences, not civil detainees. District courts in this circuit have accordingly held that a substantive due process claim challenging "not only the conditions under which [a petitioner] is being held, but also [his] 'lengthy confinement' under those conditions" sounds in habeas. *Doe v. LaRose*, ___ F. Supp. 3d ___, 2026 WL 2415261, at *3 (C.D. Cal. Aug. 18, 2026) (quoting *Guillermo M.R. v. Albarran*, No. 25-cv-05436-RFL, 2026 WL 1486580, at *5 (N.D. Cal. May 27, 2026)); accord *Romo v. Chestnut*, No. 26-cv-03449-KES, 2026 WL 2254385, at *5 n.5 (E.D. Cal. Aug. 4, 2026). That is precisely this claim. No set of conditions available at Adelanto can render constitutional the continued detention of a sixty-seven-year-old, post-gastrectomy oncology patient who is COVID-positive, cannot walk unassisted, and is cut off from the treating providers who have managed his cancer surveillance since 2019. (¶¶ 14, 50–65.)

100. Exhaustion is excused. Exhaustion of administrative remedies is prudential, not jurisdictional, and is waived where "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017). Each ground is satisfied here. The Board of Immigration Appeals "has no jurisdiction to decide questions of the constitutionality of the immigration laws." *Liu v. Waters*, 55 F.3d 421, 426 (9th Cir. 1995). An Immigration Judge conducting a custody redetermination under 8 C.F.R. § 1003.19 has no authority to decide whether the conditions of a detainee's confinement have rendered his detention punitive; that question was not, and could not have been, presented to Judge Barrett on August 27, 2026. (¶¶ 46–47.) *See Castillo v. Barr*, 449 F. Supp. 3d 915, 920 (C.D. Cal. 2020) (substantive due process claims need not be exhausted because they exceed the

agency's jurisdiction). And Petitioner's deteriorating health constitutes irreparable injury sufficient to excuse exhaustion in its own right. (¶¶ 61–65.) *Doe v. LaRose*, 2026 WL 2415261, at *3.

101. Section 1226(e) is no bar. That provision withdraws review of the Attorney General's discretionary judgment; it does not bar "challenges [to] the statutory framework that permits [a noncitizen's] detention without bail." *Demore v. Kim*, 538 U.S. 510, 516–17 (2003). Petitioner does not ask this Court to reweigh the *Guerra* factors. He asks it to decide a constitutional question no immigration court may reach.

**B. Governing Standard**

102. The Due Process Clause protects "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). "Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that Clause protects." *Id.* at 690. Civil immigration detention serves exactly two legitimate regulatory purposes: preventing flight and protecting the community. *Id.*

103. Civil detainees "retain greater liberty protections than individuals detained under criminal process," and "[a]t a bare minimum," a person detained under civil process "cannot be subjected to conditions that 'amount to punishment.'" *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Punitive conditions are shown "(1) where the challenged restrictions are expressly intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless 'excessive in relation to the alternative purpose,' or 'are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods.'" *Id.* (quoting *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004), and *Hallstrom v. City of Garden*

*City*, 991 F.2d 1473, 1484 (9th Cir. 1993)). Petitioner proceeds under the second branch.

104. Where a civil detainee is confined "in conditions identical to, similar to, or more restrictive than" those imposed on criminal detainees, the conditions are presumptively punitive and the burden shifts to the government to justify them. *Jones*, 393 F.3d at 932–34. Petitioner is held in a for-profit correctional facility under a custodial regime indistinguishable from that imposed on persons charged with crimes. The presumption applies, and Respondents bear the burden of rebutting it.

105. *Demore v. Kim* does not foreclose this claim. *Demore* resolved a facial challenge, 538 U.S. at 513, and the Supreme Court has since confirmed that its detention decisions do "not foreclose . . . constitutional challenges to applications of" the detention statutes. *Nielsen v. Preap*, 586 U.S. 392, 420 (2019); *see Perera v. Jennings*, 598 F. Supp. 3d 736, 744 (N.D. Cal. 2022); *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 208–10 (3d Cir. 2020); *Black v. Decker*, 103 F.4th 133, 149 & n.22 (2d Cir. 2024). Petitioner brings an as-applied challenge grounded in his own circumstances.

106. Courts in this circuit apply five factors in determining whether civil immigration detention has become punitive: (1) the length of detention and whether it is excessive in relation to its regulatory purpose; (2) the government's contribution to any delay; (3) the evidence supporting the determination that detention is warranted to prevent flight risk or community danger; (4) whether the government's interests in ensuring appearance and protecting the community could be protected through less harsh alternatives to detention; and (5) the conditions of detention and how they compare to the conditions under which pretrial or convicted criminal detainees are held. *Doe v. Becerra*, 723 F. Supp. 3d 688, 692 (N.D. Cal. 2024); *Guillermo M.R.*, 2026 WL 1486580, at *3–4; *Doe v. LaRose*, 2026 WL 2415261, at *3. Every factor favors Petitioner.

**C. The Five Factors Establish That Petitioner's Detention Has Become Punitive**

**1. Length of detention and its relation to the regulatory purpose.**

107. Petitioner has been detained since July 24, 2026. (¶ 59.) He does not contend that this period is lengthy in the abstract. But duration is one factor among five, not a threshold, and the inquiry is comparative: the question is whether the deprivation is excessive *in relation to* the purpose it serves. Courts in this circuit have ordered release far sooner where the conditions of confinement endanger the detainee's life. *See Sumano v. Chestnut*, No. 1:26-cv-04954-KES-CDB, 2026 WL 2177112, at *4 (E.D. Cal. July 28, 2026) (collecting cases); *J.C.L. v. Warden, Adelanto ICE Processing Center*, No. 5:26-cv-04889-PD, Dkt. No. 17 (C.D. Cal. Sept. 1, 2026) (ordering release of Adelanto detainee approximately three months into custody).

108. Nor will this detention be brief. Petitioner's next hearing is set for September 23, 2026. USCIS has administratively closed his Form I-485 and confirmed that jurisdiction over his adjustment application now lies exclusively with EOIR. He must therefore litigate an adjustment application to completion — and, if unsuccessful, appeal — before any removal could occur. (¶¶ 21, 44–45, 49.) On the Government's own theory, Petitioner will remain confined for many months more.

**2. The Government's contribution to the posture of this case.**

109. ICE received the USCIS lead referral identifying Petitioner on June 17, 2026 and certified a translation of the Korean warrant on July 12, 2026, but did not arrest him at the home whose address it possessed. It waited and took him at a Government-scheduled appointment on July 24, 2026. It then withheld the warrant from the Immigration Court until August 23, 2026 — a month after the arrest and four days before the bond hearing. Petitioner's adjustment application, pending since December 9, 2024, was administratively closed on July 27, 2026 as a direct consequence of the removal proceedings the Government initiated, requiring him to

begin again before EOIR. The delay attributable to Petitioner is zero: he waived his ten-day period and requested a prompt hearing within hours of arrest. (¶¶ 11, 19, 27, 28–31, 41, 44.)

**3. The evidence supporting flight risk or dangerousness.**

110. There is no dangerousness finding. The Immigration Judge made none, and DHS has never alleged that Petitioner is a danger to persons, property, or national security. The Notice to Appear charges a single ground — overstay under INA § 237(a)(1)(B). (¶¶ 25(e), 39, 48.) One of the two legitimate purposes for civil detention is therefore absent entirely.

111. The flight-risk finding rests on a single document: an unadjudicated, ex parte foreign arrest warrant. (¶¶ 25(c), 47.) A habeas petitioner may rebut in this Court the evidence an Immigration Judge credited below, and where the Government fails to contest that rebuttal, this factor favors release. *Doe v. LaRose*, 2026 WL 2415261, at *4 (granting the writ where the petitioner rebutted evidence that had supported an IJ's dangerousness and flight-risk findings). *Doe* is instructive *a fortiori*: the petitioner there was the subject of an INTERPOL Red Notice predicated on a foreign national arrest warrant, faced theft and threat allegations, and had been denied custody redetermination by an IJ. The writ issued nonetheless. Release is likewise warranted even where an IJ's adverse custody finding is sustained. *Perez v. Wolf*, 445 F. Supp. 3d 275, 280–83, 287–95 (N.D. Cal. 2020); *Singh v. Barr*, No. 20-cv-02346-VKD, 2020 WL 1929366, at *10 (N.D. Cal. Apr. 20, 2020); *Bent v. Barr*, 445 F. Supp. 3d 408, 418 (N.D. Cal. 2020).

112. The warrant here is materially weaker than the evidence rejected in *Doe*. There is no conviction, and an accusation is not a conviction under 8 U.S.C. § 1101(a)(48)(A). There is no Red Notice, no extradition request, no request for provisional arrest, and no communication of any kind from the Republic of Korea concerning Petitioner. The warrant issued one day after it was requested, in a proceeding at which Petitioner was neither present nor heard, and he did not learn of

its existence until after his arrest. The warrant's own boxes for "[t]he suspect did not respond to the investigative authorities' request to appear without justifiable reason" and "[t]he suspect has no fixed residence" are unchecked. The conduct alleged predates Petitioner's March 2005 admission, and on information and belief falls outside the applicable limitations period under Korean law. DHS itself did not treat the warrant as disqualifying: USCIS approved the immediate-relative petition fifteen months after the warrant issued. (¶¶ 23–26, 27(a).)

113. The affirmative evidence against flight is unusually strong. Petitioner has lived at the same disclosed address for ten years — the address he gave the Government, the address DHS recorded, and the address to which USCIS mailed its notice. He has never been arrested in the United States, never failed to appear for any proceeding or appointment, and never been in removal proceedings. He placed himself before the Government voluntarily in December 2024, appeared for biometrics, and appeared on time for the July 24, 2026 interview with his United States citizen daughter. Offered voluntary return on Form I-826, he declined it and requested a hearing three separate times within hours of his arrest. Most significantly, he is the beneficiary of an approved immediate-relative petition with a visa immediately available; adjustment before EOIR is his only pathway to lawful status, and it exists only so long as he remains present and appears. (¶¶ 2, 11, 17, 19–22, 30, 33, 40–43, 45.) Flight would forfeit the very relief he has spent nineteen months pursuing.

**4. Less harsh alternatives are available.**

114. Even a legitimate objective cannot be pursued through means that are "excessive in relation to" it or that could be "accomplished in so many alternative and less harsh methods." *Jones*, 393 F.3d at 932. Whatever residual appearance interest the Government retains can be secured by bond, electronic monitoring, telephonic or in-person reporting, curfew, surrender of Petitioner's Korean passport, third-party custodianship by his United States citizen daughter, or any combination.

Petitioner has a fixed residence, a lawful permanent resident wife of forty-one years, two daughters and grandchildren in this country, and community sponsors who have attested under penalty of perjury that he will comply. (¶¶ 10–13.) Should this Court set a bond, Petitioner's financial circumstances must be considered. *Hernandez v. Sessions*, 872 F.3d at 990–93. Conditions of release should be tailored to his medical limitations; an ankle monitor is inappropriate for a patient who cannot ambulate unassisted. (¶ 63.) *Cf. J.C.L.*, Dkt. No. 17 at 11.

**5. The conditions of Petitioner's detention.**

115. Petitioner is 67 years old. Most of his stomach was removed in a subtotal gastrectomy following an aggressive, poorly differentiated gastric adenocarcinoma with signet ring cells; the wound became infected and required two additional operations and a year with an abdominal wound vacuum. Gastric adenocarcinoma remains an active problem under surveillance requiring regular laboratory testing and imaging. He has type 2 diabetes, anemia, vitamin B12 and vitamin D deficiencies, and he was hospitalized for sepsis in July 2025 after collapsing at home. His treating provider warned on July 29, 2026 that interruption of his care "could result in worsening of his chronic medical conditions, delays in identifying potential complications, and adverse health outcomes." DHS was on notice: its own Form I-213 records his surgical scars, his report of stomach cancer, and that "[t]he subject does not claim good health." (¶¶ 50–57.)

116. Since detention, his condition has deteriorated. He was initially able to receive his diabetes medication and is now unable to obtain it; when he reports symptoms and medication is ordered, it arrives roughly a week later and is not the medication he had been taking. He missed his August 21, 2026 follow-up appointment. On September 1, 2026 he tested positive for COVID-19 and was placed alone in isolation. He has since become extremely weak, can no longer walk without assistance, has been issued a walker by the facility, and experiences constant dizziness and the sensation that he is about to faint. The last time Petitioner fainted,

in July 2025, he was found to be septic and required hospitalization. Every one of his conditions — age, active malignancy, prior chemotherapy, gastrectomy, diabetes, recent sepsis — is a recognized risk factor for severe illness and death from COVID-19. (¶¶ 58, 61–65.)

117. These are the very circumstances in which courts in this circuit have found detention excessive in relation to its purpose. *Sumano*, 2026 WL 2177112, at *4 ("[D]etention may be excessive in relation to a legitimate purpose if the conditions at a detention facility threaten a detainee's life."); *Doe v. LaRose*, 2026 WL 2415261, at *4 (delays in urgent care); *Romo*, 2026 WL 2254385, at *5–6 (post-stroke treatment delays); *Sorio v. Hermosillo*, No. 2:25-cv-02492-TL, 2026 WL 413530, at *10–12 (W.D. Wash. Feb. 13, 2026) (one-month delay in specialist referral); *Perez v. Wolf*, 445 F. Supp. 3d at 292–95; *Pimentel-Estrada v. Barr*, 458 F. Supp. 3d 1226, 1251 (W.D. Wash. 2020) (elderly petitioner). And on facts materially similar to these, at this same facility, this Court ordered release days before this Petition was filed. *J.C.L.*, Dkt. No. 17 at 8–9.

118. The inadequacy of medical care at Adelanto is not a matter of Petitioner's say-so. On July 16, 2026 — eight days before Petitioner's arrest — this Court preliminarily enjoined Respondents in *L.T. v. U.S. Immigration & Customs Enforcement*, No. 5:26-cv-00322-SSS-SP (C.D. Cal.), Dkt. No. 104, finding plaintiffs likely to prevail on Fifth Amendment and Rehabilitation Act claims arising from the denial of medical care and disability accommodations at Adelanto East and West, ordering the immediate appointment of a medical monitor and a conditions monitor and the development of a remediation plan, and provisionally certifying a class of all persons detained at that facility. Petitioner has been detained at that facility since July 24, 2026 and is a member of that class. (¶ 59.) Petitioner requests that the Court take judicial notice of that order. Fed. R. Evid. 201. Respondents' generic invocation of the National Detention Standards cannot answer facility-specific findings. *See J.C.L.*, Dkt. No. 17 at 8.

119. That injunction does not moot this claim; it corroborates it. A remediation plan filed on July 30, 2026 has not reached this patient. Petitioner tested positive for COVID-19 on September 1, 2026, cannot obtain his diabetes medication, and cannot walk unaided. (¶¶ 61–63.) Prospective classwide relief directed at systemic reform is not an answer to the individual constitutional injury being inflicted on a sixty-seven-year-old cancer patient today, and it supplies no remedy for the deprivation of *liberty* that is the subject of this Petition.

**D. Conclusion**

120. Petitioner is a lawfully admitted noncitizen whom the Government left undisturbed for nineteen years, who came forward voluntarily, whose immediate-relative petition the Government approved, whom no court has found dangerous, and whose only path to lawful status requires his continued presence and appearance. He is detained on the strength of an unadjudicated foreign accusation, in a facility this Court has enjoined for constitutionally deficient medical care, while he is COVID-positive, unable to walk, and separated from the oncology team that has treated him since 2019. Whatever marginal assurance of appearance his confinement provides beyond available alternatives, it is bought at a price the Constitution does not permit. His detention is excessive in relation to its regulatory purpose and has become punitive in violation of the Fifth Amendment.

121. Release is the ordinary remedy for unlawful executive detention. *Munaf v. Geren*, 553 U.S. 674, 693 (2008). To prevent that remedy from being "rendered meaningless," the Court should further enjoin Respondents from re-detaining Petitioner on the same basis. *Doe v. LaRose*, 2026 WL 2415261, at *4; *see Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 320–21 & nn.19–20 (E.D.N.Y. 2025); *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 373 (S.D.N.Y. 2019). In the alternative, Petitioner requests a bond hearing at which Respondents

bear the burden of justifying his continued detention by clear and convincing evidence.

**COUNT THREE**

**Unlawful Arrest and Detention Without a Warrant —**

**8 U.S.C. § 1226(a), 8 U.S.C. § 1357(a)(2), and 8 C.F.R. §§ 236.1(b), 287.8(c)(2)(ii)**

122. Petitioner realleges and incorporates each preceding paragraph.

**A. Section 1226(a) Authorizes Detention Only on a Warrant, and Respondents Have Invoked No Other Authority**

123. "As a general rule, it is not a crime for a removable alien to remain present in the United States," and a Notice to Appear "does not authorize an arrest." *Arizona v. United States*, 567 U.S. 387, 407 (2012). "The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process." *Id.*

124. The default rule is a warrant. Section 1226(a) provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a) (emphasis added). "Issuance of a warrant is a necessary condition to justify discretionary detention under section 1226(a). . . . As such, it follows that absent a warrant a noncitizen may *not* be arrested and detained under section 1226(a)." *Chogllo Chafla v. Scott*, 804 F. Supp. 3d 247, 264 (D. Me. 2025) (emphasis in original), quoted in *Jose G.R. v. Warden*, 2026 U.S. Dist. LEXIS 54231, at *3 (E.D. Cal. Mar. 16, 2026), *Jesus Emery M.F. v. Warden of the Golden State Annex Det. Facility*, 2026 U.S. Dist. LEXIS 66190, at *3 (E.D. Cal. Mar. 26, 2026), and *Galvez-Mondragon v. Warden, Cal. City Corr. Ctr.*, No. 1:26-cv-04801-DAD-CKD, 2026 U.S. Dist. LEXIS 151996, at *3–4, 2026 WL 1992900, at *2 (E.D. Cal. July 9, 2026). The implementing regulations say the same. 8 C.F.R. § 236.1(b); *id.* § 287.8(c)(2)(ii) ("A warrant of arrest shall be obtained except when the

designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.”).

125. Respondents selected § 1226(a) themselves, and every document in this record confirms it. The Form I-286 recites that the custody determination was made under section 236 of the Immigration and Nationality Act. (¶ 36.) The Notice to Appear checks the box “You have been admitted to the United States, but are removable,” and leaves unchecked the boxes for an arriving alien and for an alien not admitted or paroled. (¶ 39.) USCIS independently determined that Petitioner “[is] not an ‘arriving alien.’” (¶ 44.) And the Immigration Court conducted a § 1226(a) custody redetermination on August 27, 2026. (¶ 47.) Neither § 1225(b) nor § 1231 is in play. Respondents are bound by the statutory condition attached to the authority they invoked.

### B. The Form I-200 in This Record Does Not Satisfy § 1226(a); On Its Face It Was Generated After the Arrest

126. Petitioner was arrested at approximately 10:00 a.m. on July 24, 2026, in an interview room at 300 North Los Angeles Street, at the conclusion of the interview the Government itself had scheduled. Nothing in the record reflects that any warrant of arrest was issued or served before that moment. (¶¶ 30–31, 34.)

127. The Form I-200 Warrant for Arrest of Alien is dated the day of the arrest. It is signed by SDDO G. Sahagun, who is not among the three officers the Form I-213 identifies as having made the arrest. Its certificate of service records service on Petitioner on July 24, 2026 by Deportation Officer Serna — one of the arresting officers. (¶ 35.)

128. The probable cause the warrant recites rests on events that occurred at or after the arrest. Only two bases are invoked.

a. **”[T]he execution of a charging document to initiate removal proceedings against the subject.”** The charging document is the Notice

to Appear, which was served on Petitioner in the course of the same seizure and which the same SDDO Sahagun signed. (¶¶ 35, 39.) A warrant cannot draw its probable cause from a charging document executed as part of the arrest it is said to authorize.

b. **"[S]tatements made voluntarily by the subject to an immigration officer."** The Form I-213 places the statements it attributes to Petitioner in the portion of the narrative describing what followed the arrest, after officers "arrested OH and escorted him to the ICE detention area for processing." (¶¶ 31, 35.) Statements taken during post-arrest processing cannot supply probable cause for the arrest that produced them.

129. The remaining paperwork confirms the sequence. The Form I-286 Notice of Custody Determination, signed by the same SDDO Sahagun, is time-stamped "07/24/2026 12:19 PM" — more than two hours after the arrest. (¶ 36.)

130. An administrative warrant generated after the seizure does not satisfy § 1226(a). *Galvez-Mondragon* is directly on point. There, as here, the petitioner was a nonimmigrant overstay taken in what the government described as a targeted ICE operation in Los Angeles; there, as here, the government produced a Form I-213 bearing the date of the arrest that recited information the detainee supplied to officers only after he was taken into custody; and there, as here, the government produced a Form I-200 bearing the same date. The court held that this showing did not establish an arrest made pursuant to a warrant, because on that record it "must presume" the document to be an administrative warrant "created after the fact." 2026 U.S. Dist. LEXIS 151996, at *4. It followed *Florida v. United States*, 660 F. Supp. 3d 1239, 1277 (N.D. Fla. 2023), which holds that § 1226(a) is not satisfied where the government places an administrative warrant into the file after making the arrest. The court ordered immediate release. *Id.* at *4–5.

131. The record here is stronger than the record in *Galvez-Mondragon* in three respects. First, the presumption that court drew from the shared date is here supplied

by the document itself: the warrant does not merely bear the date of the arrest, it identifies as its probable-cause basis two events that postdate the arrest. Second, the officer who signed the warrant was not among the officers who made the arrest, and the certificate of service records service by an arresting officer on the same day. Third, the accompanying custody determination is affirmatively time-stamped more than two hours after the arrest. (¶¶ 34–36.)

132. Under 28 U.S.C. § 2243 the burden of showing cause rests on Respondents. Petitioner respectfully requests that any order to show cause direct Respondents to lodge the Form I-200 together with any record reflecting the time of its issuance, the complete Form I-213 file, the custody log, and any A-file or EARM entry reflecting when the warrant was generated. If Respondents cannot establish that a warrant issued before officers seized Petitioner at approximately 10:00 a.m. on July 24, 2026, his arrest and detention under § 1226(a) were unauthorized.

**C. If No Warrant Preceded the Arrest, § 1357(a)(2) Is the Only Possible Authority, and Its Escape Predicate Fails on This Record**

133. Where no warrant has issued, immigration officers have "more limited authority." *Arizona*, 567 U.S. at 408. Section 1357(a)(2) permits a warrantless arrest only where the officer has reason to believe both that the person is in the United States in violation of law and that he "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see* 8 C.F.R. § 287.8(c)(2)(ii). The escape predicate is a distinct and independently necessary element.

134. This Court confronted the same statutory question three weeks after Petitioner's arrest in *Petrashkevich v. Mullin*, 2026 U.S. Dist. LEXIS 184087 (C.D. Cal. Aug. 12, 2026). Because the petitioner there "has resided and worked consistently at the same business in the United States" and was traveling to sit for a professional examination, the court held that those facts "support the inference that Petitioner was not fleeing from immigration authorities but was planning to return

to his residence and workplace." *Id.* at *7. The court found that Respondents had "not sufficiently rebutted Petitioner's claim that he was arrested without a valid warrant," granted the petition on that count alone, ordered release within twenty-four hours, and declined to reach the remaining claims. *Id.* at *7–9. *Accord Rivera v. Mullin*, No. 5:26-cv-04197-KES, 2026 WL 2276935, at *3 (C.D. Cal. Aug. 6, 2026); *Yanez v. Johnson*, No. 5:26-cv-03518-SRM-ACCV, 2026 WL 2121260, at *2 (C.D. Cal. July 16, 2026).

135. The inference is far stronger here, because Petitioner was not traveling at all. He was inside a federal building, on a date and at an hour the Government itself had fixed, for an appointment the Government had scheduled, carrying the documents the Government had asked him to bring, accompanied by the United States citizen daughter who had petitioned for him and who had flown in from Las Vegas to attend. He checked in with building security. He sat for the interview. He was arrested at its conclusion. He did not resist, did not attempt to leave, and did not try to avoid the appointment. (¶¶ 22, 30–33.) A person likely to escape does not walk into the agency that is looking for him and hand over his file.

136. Respondents had ample opportunity to obtain a warrant and did not take it.

a. They knew where Petitioner lived. The Form I-213 records the Gramercy Place address at which he had lived for ten years and which he had given the agency on his own filings, and ICE did not go there. (¶¶ 11, 29.)

b. The Foreign Fugitive Unit received the USCIS lead referral on June 17, 2026 — five weeks before the arrest. (¶ 28.)

c. DHS certified an English translation of the Korean arrest warrant on July 12, 2026 — twelve days before the arrest. (¶ 27(b).)

d. The Government itself had calendared the appointment, and so knew precisely where Petitioner would be and when. (¶¶ 22, 37.)

e. The Form I-213 describes the arrest as made "pursuant to a targeted enforcement operation," and records that officers went to the building, observed "the target OH" enter at approximately 0845, waited through the USCIS interview, and entered the interview room at approximately 1000. (¶ 31.)

An operation directed at a known target, at a known location, at an hour the Government itself had calendared, and planned at least twelve days in advance, is the definitional opposite of circumstances leaving no time to obtain a warrant. The § 1357(a)(2) exception exists for exigency. There was none.

137. Nor does the record contain any finding of escape risk, or any fact capable of supporting one. The Form I-213 records the disposition as "Warrant of Arrest/Notice to Appear" and contains no escape-risk assessment whatever. (¶ 38.) The Form I-286 recites none. (¶ 36.) The Notice to Appear charges a single ground — overstay under INA § 237(a)(1)(B) — and alleges no criminal, fugitive, or security ground and no dangerousness. (¶¶ 25(e), 39.)

138. Respondents' own conduct over nineteen years refutes any such belief. USCIS last adjudicated Petitioner's status on January 19, 2007, and for more than seventeen years after his authorized stay expired the Government issued no charging document, sought no warrant, made no arrest, and never asked him to depart. (¶ 15.) Beginning in December 2024, Petitioner placed himself directly before the agency: he filed an I-485 disclosing his identity, his address, his entry, his nonimmigrant history, and his overstay; he appeared for biometrics as instructed; the agency retained his application, approved the underlying petition, and scheduled him for an interview — all without detaining him. (¶¶ 17, 19–22.) Detention that Respondents did not think necessary for nineteen years did not become an emergency on the morning of July 24, 2026.

139. The Korean arrest warrant does not supply the missing element, and Respondents' handling of it shows they did not treat it as one. USCIS approved

Petitioner's I-130 fifteen months after that warrant issued. (¶¶ 23, 27(a).) DHS certified a translation of it twelve days before the arrest and recorded it in the I-213 on the day of the arrest, yet charged no criminal or fugitive ground, alleged no dangerousness, and did not lodge it with the Immigration Court until August 23, 2026 — a month after the arrest and four days before the bond hearing. (¶ 27(b)–(d).) That is not the conduct of an agency acting on a belief in imminent flight. The warrant's own escape-related findings are, in any event, absent: the boxes stating that the suspect failed to respond to a summons and that the suspect has no fixed residence are both unchecked. (¶ 25(d).)

140. Petitioner's conduct in the hours after the arrest is the final answer. Offered on the Form I-826 the option to give up his hearing and return to Korea as soon as arrangements could be made, he declined it and initialed instead: "I request a hearing before the Immigration Court to determine whether I may remain in the United States." He separately signed a Request for Prompt Hearing, waiving his ten-day period. And on the Form I-286 he checked the box requesting immigration judge review of the custody determination. (¶¶ 40–43.) Three times in a single afternoon, the man Respondents seized as likely to escape the country asked to remain in it and be heard.

**D. The Remedy Is Release**

141. The remedy for a detention that lacks statutory authority is release, not a subsequent proceeding to supply the authority. "Where the record shows Respondents have not identified a valid statutory basis for detention in the first place, the remedy is not to supply one through further proceedings." *Yociris P. v. Bondi*, 2026 WL 327937, at *3 (D. Minn. Feb. 8, 2026), quoted in *Jose G.R.*, 2026 U.S. Dist. LEXIS 54231, at *3, and *Jesus Emery M.F.*, 2026 U.S. Dist. LEXIS 66190, at *3; *see A.E.R.T. v. Wofford*, 2025 WL 3645297, at *2 (E.D. Cal. Dec. 16, 2025); *J.A.C.P. v. Wofford*, 2025 WL 3013328, at *8 (E.D. Cal. Oct. 27, 2025).

142. The August 27, 2026 bond hearing does not cure the defect, and Respondents cannot argue otherwise on this authority. "The language of § 1226(a)'s warrant requirement is unequivocal and does not afford the Government forgiveness simply by providing a bond hearing after the fact." *Jose G.R.*, 2026 U.S. Dist. LEXIS 54231, at *3. A custody redetermination asks whether detention should continue; it cannot retroactively supply the statutory predicate the seizure lacked.

143. *Galvez-Mondragon* controls this point on facts indistinguishable from Petitioner's. The government there argued precisely what Respondents may be expected to argue here — that the petitioner "received all of the process he was due" under § 1226(a) because he had been given a bond hearing. 2026 U.S. Dist. LEXIS 151996, at *2. That petitioner had in fact received a bond hearing at which the immigration judge denied bond on a finding of flight risk, and his appeal from that denial was pending before the Board of Immigration Appeals. *Id.* at *2–3. The court found the argument unpersuasive, holding that a post-deprivation bond hearing is an inadequate safeguard because it comes only after the detention and so cannot address an erroneous deprivation of liberty. *Id.* at *3 (quoting *Lucena-Ojeda v. Noem*, No. 2:26-cv-00085-BAT, 2026 U.S. Dist. LEXIS 22394, 2026 WL 279353, at *2 (W.D. Wash. Feb. 3, 2026)). It then reached the warrant defect and ordered immediate release notwithstanding the completed bond proceeding and the pending administrative appeal. *Id.* at *3–5.

144. Petitioner stands in the same posture, and in a weaker one for Respondents. Bond was denied on August 27, 2026 on a flight-risk finding, with the burden placed on Petitioner; no written memorandum has issued; and his appeal to the Board is due September 28, 2026. (¶¶ 47–48.) If a completed bond hearing, a flight-risk denial, and a pending BIA appeal did not save the government's after-the-fact warrant in *Galvez-Mondragon*, they cannot save it here.

145. Section 1226(e) poses no bar to this Count. Petitioner does not ask the Court to review any discretionary custody judgment. He asks whether Respondents

complied with the express statutory condition on the authority they themselves invoked — a pure question of law. *Martinez v. Clark*, 124 F.4th 775, 781–82 (9th Cir. 2024); *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011).

146. Finally, *Petrashkevich* held that “the absence of opposition to Petitioner’s 8 U.S.C. § 1357(a)(2) claim itself is a basis to grant the Petition,” citing *Soleimani v. LaRose*, No. 25-cv-3082-DMS-DEB, 2025 WL 3268412, at *3 (S.D. Cal. 2025), and *Singh v. Chiang*, No. ED CV 25-3024 FMO (SP), 2025 WL 4058328, at *4 (C.D. Cal. 2025). 2026 U.S. Dist. LEXIS 184087, at *8. The respondents there conceded that the petitioner was held under § 1226(a) but never addressed his statutory claim. Should Respondents take the same course here, that concession is independently dispositive.

147. Count Three is independently sufficient. *Petrashkevich*, *Jose G.R.*, and *Galvez-Mondragon* each granted the writ and ordered release on this ground, without regard to the petitioner’s remaining claims or to any custody proceeding already had. Petitioner’s arrest and continued detention exceeded Respondents’ statutory authority under 8 U.S.C. §§ 1226(a) and 1357(a)(2), and the writ should issue.

## VII. A LIMITED PERMANENT INJUNCTION AGAINST RE-DETENTION IS WARRANTED

148. Injunctive relief is a proper habeas remedy. *Perera v. Jennings*, 598 F. Supp. 3d 736, 742 (N.D. Cal. 2022). “In habeas cases, federal courts have broad discretion in conditioning a judgment granting relief,” *Lujan*, 734 F.3d at 933, and are authorized under 28 U.S.C. § 2243 “to dispose of habeas corpus matters as law and justice require,” *id.* (quoting *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987)).

149. A permanent injunction may issue where the movant shows “(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Where the opposing party is the government, the third and fourth factors merge. *Garcia v. County of Alameda*, 150 F.4th 1224, 1234 (9th Cir. 2025); *see Nken v. Holder*, 556 U.S. 418, 435 (2009).

150. Petitioner makes that showing. He has suffered an irreparable injury by being detained in violation of due process, and would suffer it again if Respondents repeat that conduct; unconstitutional deprivation of physical liberty is irreparable harm. *Hernandez*, 872 F.3d at 994–95. For a sixty-seven-year-old cancer patient who has lost the ability to walk unassisted in six weeks of confinement, the harm of re-detention is not theoretical. (¶¶ 61–65.) Damages would not cure it. And the equities favor a limited injunction: requiring basic process before any re-detention costs Respondents only a short delay if they can justify detention to a neutral decisionmaker, while its absence would force Petitioner to suffer detention and file a second habeas petition to undo it. The public has a strong interest in upholding procedural protections against unlawful detention. *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

151. This case presents a concrete factual basis for prospective relief, not a generalized fear of re-arrest. Respondents left Petitioner at liberty for nineteen years, then seized him at an appointment the Government had itself scheduled, on the strength of a foreign accusation they had held for sixteen months, using a warrant that on its face was generated after the seizure. (¶¶ 15, 23–39.) That is a method, not an accident: courts in this District have addressed the same pattern — a USCIS lead referral, an interview-room arrest, a sole overstay charge — repeatedly in recent months. *Yu*, 2026 U.S. Dist. LEXIS 189002; *Jam*, 2026 U.S. Dist. LEXIS 132441; *Xingang Zhao*, 2026 U.S. Dist. LEXIS 102817; *Grigoryan*, 2026 U.S. Dist. LEXIS 159668. Petitioner remains subject to the same interview and hearing obligations before EOIR that brought him within reach in the first place. (¶¶ 45, 49.) Absent an

injunction, nothing in this record suggests Respondents would treat a release order as a constraint on re-arresting him at his next appearance on the same undisclosed basis.

152. The injunction sought is narrow and targeted at the harms presented. It would require, before any re-detention under 8 U.S.C. § 1226: (i) compliance with the statutory predicates of the authority Respondents invoke, including issuance of a warrant of arrest before any arrest under § 1226(a); (ii) at least seven days' advance written notice; and (iii) a pre-deprivation bond hearing before an immigration judge at which Respondents bear the burden of proving by clear and convincing evidence that Petitioner is a flight risk or a danger to the community and that no condition or combination of conditions could reasonably assure his future appearance or the community's safety, with the judge conducting an individualized assessment of his suitability for bond under that standard. The notice and hearing Petitioner seeks are in addition to, not in substitution for, the statutory requirements addressed in Count Three; nothing in the requested injunction would permit a warrantless arrest that § 1226(a) forbids. Courts in this District have entered precisely this relief. *Yu*, 2026 U.S. Dist. LEXIS 189002, at *13–14; *Grigoryan*, 2026 U.S. Dist. LEXIS 159668; *Jam*, 2026 U.S. Dist. LEXIS 132441; *see also Huy Cu v. Marin*, 2026 WL 1427009, at *1–3 (C.D. Cal. May 21, 2026) (rejecting objections that prospective injunctive relief is inappropriate in immigration habeas); *Araujo-Contreras v. Janecka*, 2026 WL 1625368, at *1–4 (C.D. Cal. June 3, 2026) (same); *Mourey v. Bowen*, 2026 WL 467567, at *6 (C.D. Cal. Jan. 31, 2026); *Carballo v. Andrews*, 2025 WL 2381464, at *8 (E.D. Cal. Aug. 15, 2025); *Ixchop Perez v. McAleenan*, 435 F. Supp. 3d 1055, 1062 (N.D. Cal. 2020).

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

(1) Assume jurisdiction over this matter;

(2) Issue an order directing Respondents to show cause, within three days, why the writ should not be granted, and requiring Respondents to certify the specific statutory provision authorizing Petitioner's detention and to lodge any record reflecting the time of Form I-200 issuance, the custody log, and any A-file or EARM entry reflecting when the warrant was generated, 28 U.S.C. § 2243;

(3) Take judicial notice under Federal Rule of Evidence 201 of the July 16, 2026 preliminary injunction and provisional class certification order in *L.T. v. U.S. Immigration & Customs Enforcement*, No. 5:26-cv-00322 (C.D. Cal.), and of the September 1, 2026 order in *J.C.L. v. Warden, Adelanto ICE Processing Center*, No. 5:26-cv-04889-PD (C.D. Cal.);

(4) Issue a writ of habeas corpus and grant the Petition on Count One, Count Two, and Count Three, each of which independently warrants relief;

(5) Order Respondents to release Petitioner immediately subject only to the conditions of liberty that existed before his July 24, 2026 arrest;

(6) Enter a limited permanent injunction barring Respondents from re-detaining Petitioner under 8 U.S.C. § 1226 without first complying with the statutory predicates of the authority invoked, including issuance of a warrant of arrest before any arrest under § 1226(a), and without providing at least seven days' advance written notice and a pre-deprivation bond hearing before an immigration judge at which Respondents bear the burden of proving by clear and convincing evidence that Petitioner is a flight risk or a danger to the community and that no condition or combination of conditions could reasonably assure his future appearance or the safety of the community, and requiring that the immigration judge conduct an individualized assessment of Petitioner's suitability for bond under that standard;

(7) Order Respondents to return to Petitioner, upon release, all property and documents confiscated at or after his arrest, including his driver's license, passport, and telephone;

(8) In the alternative, and only if the Court declines to order release, order Respondents to provide Petitioner a custody hearing within seven days before a neutral decisionmaker at which Respondents bear the burden of justifying detention by clear and convincing evidence, consider Petitioner's ability to pay, and consider alternatives to detention, with any conditions of release tailored to his medical limitations;

(9) Award Petitioner costs and reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(10) Grant such other and further relief as the Court deems just and proper.

**VERIFICATION**

Pursuant to 28 U.S.C. § 2242, this Petition is signed and verified by undersigned counsel on Petitioner's behalf, Petitioner being detained and unable to execute a verification in the ordinary course. Counsel's knowledge of the matters alleged derives from his communications with Petitioner; his communications with Petitioner's family members, and his review of Petitioner's immigration and medical records, the documents submitted as exhibits to this Petition, and the orders and filings in the proceedings cited herein. On that basis, the factual allegations of this Petition are true and correct to the best of counsel's knowledge, information, and belief, and as to those matters alleged on information and belief, counsel believes them to be true. See Declaration of Magomed Gusein Gasanov ¶¶ 1–5.

Dated: September 4, 2026 Respectfully submitted,

/s/ Magomed Gusein Gasanov

Magomed Gusein Gasanov, Esq. (CA SBN: 368130)
137 S Crescent Dr., Apt. 3
Beverly Hills, CA 90212
gasanov.mgz@gmail.com
213-642-9978

Attorney for Petitioner Hyeon Kook Oh